## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **DORINDA STEEL-ROGERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | **NO. 21-40108-TSH** |
| **GLOBAL LIFE SCIENCE** | ) | |
| **SOLUTIONS USA, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANT'S MOTION TO COMPEL ARBITRATION
### August 30, 2022

**HILLMAN, D.J.**

### Introduction

Dorinda Steel-Rogers ("Plaintiff") commenced this action against Global Life Sciences Solutions USA, LLC ("Defendant", "GLS") and Kelly Services USA, LLC ("Kelly") in Middlesex Superior Court on August 27, 2021. Plaintiff alleges that, while jointly employed by GLS and Kelly, she was subjected to harassment by GLS employees, discrimination on the basis of gender and handicap status, and retaliation for requesting reasonable accommodations. Kelly removed the case to the United States District Court for the District of Massachusetts on October 22, 2021. (Docket No. 1). The parties stipulated to the dismissal of Kelly, without prejudice, on December 2, 2021, leaving GLS as the sole defendant. (Docket No. 19). GLS now moves to dismiss Plaintiff's Complaint and compel arbitration based on an arbitration clause in Plaintiff's

employment agreement with Kelly. For the following reasons, Defendants' motion to compel arbitration is **granted**.

## Background

In January 2020, Plaintiff obtained a position as a quality control helper in GLS's Marlborough, MA facility through Kelly, a temporary staffing agency. As a condition of her employment, Plaintiff signed a standard arbitration agreement, as required of all Kelly employees. The agreement includes the following language:

1. Agreement to Arbitrate. Kelly Services, Inc. and its subsidiaries ("Kelly" or "Kelly Services") and I agree to use binding arbitration, instead of going to court, for any "Covered Claims" that arise between me and Kelly Services, its related and affiliated companies, and/or any current or former employee of Kelly Services or any related or affiliated company. . .

2. Claims Subject to Agreement. The "Covered Claims" under this Agreement shall include all common-law and statutory claims relating to my employment, including, but not limited to, any claim for breach of contract, unpaid wages, wrongful termination, and for violation of laws forbidding discrimination, harassment, and retaliation on the basis of race, color, gender, age, national origin, disability, and any other protected status. I understand and agree that arbitration is the only forum for resolving Covered Claims, and that both Kelly Services and I hereby waive the right to a trial before a judge or jury in federal or state court in favor of arbitration for Covered Claims.

(Docket No. 23, Exhibit A). Plaintiff states that both GLS and Kelly controlled many aspects of her employment, including her day-to-day activities, supervision, rate of pay, personnel file, and hiring/firing decisions. She states that she was recruited and paid by Kelly, but that her work was directed and supervised by GLS employees. Her complaint treats GLS and Kelly as a single party, referring to them collectively as the "Company" and as joint employers.

Plaintiff alleges the following facts. Soon after starting at GLS in early 2020, her male supervisor, Osei, stated that he did not want her speaking to other male employees. In April 2020, Osei began a pattern of sexual assault, repeatedly touching Plaintiff inappropriately.

Despite her expressed non-consent to the touching, Osei continued his inappropriate conduct and used his position as supervisor to dissuade Plaintiff from reporting him. In June 2020, Osei gave Plaintiff a poor performance review and stated that she would not obtain the permanent position at GLS that she had expected to obtain when she took the job. Osei escalated his sexual advances and coercion attempts in July of 2020. Around the same time, Plaintiff began to experience chronic back pain that limited her physical endurance. When she reported her condition to Osei, he denied her request for accommodations in the form of short breaks during the day. Although Osei allowed Plaintiff to transfer to another department where her role was less physically demanding, her transfer was not sufficient to accommodate her back pain and, because Osei managed that department as well, he continued to sexually assault and harass her.

Around August 17, 2020, Plaintiff twice raised concerns about Osei and her back pain to Ann Gauthier, GLS's human resources representative. Gauthier said she would speak with Osei, but Osei's conduct continued. Gauthier also refused to allow Plaintiff short breaks for her back pain. On August 20, three days after re-raising her concerns to Gauthier, Osei terminated Plaintiff. Despite Plaintiff raising her concerns to Gauthier and Kelly's representative at the facility, neither GLS nor Kelly took any action to investigate or remedy Plaintiff' concerns.

Plaintiff commenced this action on August 27, 2021 in Middlesex Superior Court. Kelly removed the case to this Court on October 22, 2021, but was later dismissed without prejudice by agreement of the parties. Citing the arbitration agreement between Plaintiff and Kelly, GLS moved to compel arbitration on Plaintiff's claims and dismiss Plaintiff's complaint, without prejudice, pending arbitration. Although GLS is not a signatory to the agreement, it asserts that it is a third-party beneficiary and, alternatively, that Plaintiff is equitably estopped from avoiding arbitration. Plaintiff opposes GLS's motion.

## **Standard of Review**

The Federal Arbitration Act ("FAA") was enacted primarily to "overcome judicial hostility to arbitration agreements," *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 272 (1995), and it "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471, 474 (1st Cir. 2011) (*quoting Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)). Under the FAA, "[a] written provision in ... a contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The party seeking to compel arbitration bears the burden of proving "that a valid agreement to arbitrate exists, the movant has a right to enforce it, the other party is bound by it, and that the claim asserted falls within the scope of the arbitration agreement." *Oyola v. Midland Funding, LLC*, 295 F. Supp. 3d 14, 16–17 (D.Mass. 2018) (*citing Bekele v. Lyft, Inc.*, 199 F. Supp. 3d 284, 293 (D.Mass. 2016), *aff'd*, 918 F.3d 181 (1st Cir. 2019)).

"[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 297 (2010). The First Circuit has stated that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003) (*quoting AT&T Techs., Inc. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 648 (1986)). Although there are some exceptions, "courts should be extremely cautious about forcing arbitration in 'situations in which the identity of the parties who have agreed to arbitrate is unclear.' " *Id*. (*quoting McCarthy v.*

*Azure*, 22 F.3d 351, 355 (1ˢᵗ Cir. 1994)). "[A] 'basic precept' underlying the FAA is that 'arbitration is a matter of consent, not coercion.' " *Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 36 (1ˢᵗ Cir. 2017) (*quoting Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010)). To prove that claims are arbitrable, the moving party must show that (1) a valid arbitration agreement exists, (2) the movant is entitled to invoke the agreement, (3) the non-moving party is bound by the agreement, and (4) the asserted claim(s) fall(s) within the agreement's scope. *InterGen N.V*, 344 F.3d at 142.

"The question of arbitrability—that is, whether or not the parties have agreed to submit a dispute to arbitration—is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.' " *Álvarez-Maurás v. Banco Popular of P.R.*, 919 F.3d 617, 623 (1ˢᵗ Cir. 2019) (alteration in original) (*quoting Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). Here, neither party has suggested that the question of arbitrability has been delegated to an arbitrator. Accordingly, the issue is left to the Court. Massachusetts has recognized six theories under which a non-signatory to a contract can enforce the contract's terms against a signatory: "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing/alter ego; (5) equitable estoppel, and (6) third-party beneficiary." *Landry v. Transworld Systems, Inc.*, 485 Mass. 334, 339 (2020).

It is undisputed that GLS was not a party to the Agreement. Nevertheless, GLS maintains that Plaintiff is required to arbitrate her claims against it under two theories, third-party beneficiary and equitable estoppel. Plaintiff agrees that Kelly can invoke the arbitration agreement because it was a signatory, and has allowed for Kelly's dismissal, without prejudice, pending arbitration. (Docket No. 20). Plaintiff opposes GLS' motion to compel because GLS, as a non-signatory, is not entitled to invoke the agreement. Because GLS was not a party to the

agreement, Plaintiff also argues that her claims were not within its scope. Accordingly, a finding that GLS can invoke the agreement would undercut Plaintiff' argument regarding its scope. When interpreting an arbitration clause, "the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985).

*Choice of Law*

Although the arbitration agreement at issue states that "any disputes related to [Plaintiff'] employment relationship with Kelly Services shall be governed by the laws of the State of Michigan," (Docket No. 23, Exhibit A), Plaintiff asserts that Massachusetts law should apply. While the Defendant mentions the choice of law provision in a footnote of its memorandum, it neither applies Michigan law nor argues either way.

The analysis for third party beneficiary application is nearly identical  under either Michigan or Massachusetts law. *Compare McCarthy v. Azure*, 22 F.3d 351, 362 (1st Cir. 1994) (holding that, to compel arbitration, a third-party must show with "special clarity" that contracting parties intended to confer a benefit on the third-party) *with Kostopoulos Rodriguez, PLLC v. Green Dryclean L3, Inc.*, 2020 U.S. Dist. LEXIS 207691, *18 ("A third-party beneficiary must demonstrate with special clarity that the contracting parties intended to confer a benefit on him, considering that such status is an exception to the general rule that a contract does not grant enforceable rights to non-signatories"). Likewise, the two states' tests for equitable estoppel are nearly identical. Both  *Machado v. System4 LLC*, a Massachusetts case and *Tobel v. AXA Equitable Live Ins. Co*., a Michigan case, held that "(1) when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting the claims against a non-signatory; or (2) when the signatory raises

6

allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." *Machado v. System4 LLC*, 471 Mass. 204, 211 (2015); *Tobel v. AXA Equitable Live Ins. Co*., 2012 WL 555801, *11 (Mich. Ct. App, 09–024832). The Court will apply Massachusetts law.

*Third-Party Beneficiary*

It is well-established that "[t]hird-party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to non-signatories." *McCarthy*, 22 F.3d at 362. Thus, if GLS is a third-party beneficiary of the arbitration agreement between Plaintiff and Kelly, it could compel arbitration on Plaintiff claims despite its non-signatory status. To compel arbitration, a third party must show with "special clarity", *id.* – or point to clear and definite evidence – that the signatories intended their agreement to benefit a third party. *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630-531 (2009); *Landry*, 485 Mass. at 338.

To show with special clarity that Plaintiff and Kelly intended to confer the benefit of the arbitration agreement on GLS, GLS points to the language of both the agreement itself and Plaintiff's Complaint. The Agreement at issue requires Plaintiff "to use binding arbitration … for any "Covered Claims that arise between [her] and Kelly Services, [and Kelly's] related and affiliated companies." GLS highlights that Plaintiff' complaint effectively treats Kelly and GLS as a single entity, referring to them as a singular "company" and asserting that the two entities were her joint employers at the Marlborough facility. Plaintiff also alleges that GLS and Kelly aided and abetted one another. According to GLS, Plaintiff' complaint  and the language of the Agreement both demonstrate that GLS is one of the "related and affiliated companies" that the arbitration agreement was intended to benefit.

7

Plaintiff asserts that the language of her complaint is insufficient evidence of the parties'
intent for GLS to benefit from the arbitration agreement. Citing *Landry v. Transworld*, she
argues that "[f]or evidence of intent to include [a non-signatory] as a third-party beneficiary to be
considered 'clear and definite,' there must, at a minimum, be no ambiguity in the arbitration
provision as to whether [the non-signatory] could enforce it." 485 Mass. 334, 339 (2020) 485
Mass. at 342. Plaintiff' position is that inclusion of the "related and affiliated companies"
language in the Agreement creates ambiguity as to the parties that can benefit from the
agreement, and thus disqualifies those terms from serving as clear and convincing evidence of
intent. Furthermore, Plaintiff argues that treating GLS and Kelly as affiliated or related
misconstrues the definitions of "affiliated" and/or "related company" because an entity is neither
affiliated with nor related to its customers. Plaintiff contends that Kelly had the ability to
explicitly include customers as beneficiaries to the arbitration agreement, but failed to do so. As
support, Plaintiff relies on cases where there is no indication that the signatories to an agreement
intended any third parties to benefit. *See e.g., Oldham v. Nova Mud, Inc.* 2021 U.S. Dist. LEXIS
169456, *6 (addressing contract language: "you and RigUp agree that every dispute arising in
connection with these Terms will be resolved by binding arbitration"). However, because the
inclusion of "related and affiliated parties" indicates that there are intended beneficiaries outside
of Plaintiff and Kelly, an analysis of the agreement's actual language helps decipher the parties'
intent.

In the context of business entities, the First Circuit has defined an "affiliate" to be "[a]
corporation related to another corporation by shareholdings or other means of control; a
subsidiary, parent, or sibling corporation." *Bacardí Int'l Ltd. v. V. Suárez & Co.*, 719 D.3d 1 (1st
Cir. 2013). Under this definition, a customer like GLS is not an "affiliated entity" unless it shares

8

some alternate connection with the other entity. The First Circuit has also defined "related" in the commercial context. In *Mass. Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors*, the Court used "related companies" to describe a group of entities that were owned by the same principles and that shared office space and a phone number. *See* 343 F.3d 18, 20 (1st Cir. 2003). Likewise, *Jet Wine & Spirits v. Bacardi & Co.* used "related company" to describe an entity within the same corporate family as another. *See* 298 F.3d 1, 10 (1st Cir. 2003). Language in a contract is ambiguous "if it is reasonably susceptible to different interpretations." *Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 4 (1st Cir. 2012) (*quoting Champagne v. Victory Homes, Inc.*, 2006 ME 58, 897 A.2d 803, 805 (Me. 2006)). The Court could find that "related and affiliated companies" is ambiguous because it's meaning reasonably susceptible to both its colloquial definition and its definition in a commercial context.

That the arbitration agreement describes non-signatory beneficiaries using terms with contextual definitions indicates *potential* ambiguity in the parties' intent. Although Plaintiff's treatment of GLS and Kelly as a single entity is evidence of her intent for third parties to benefit from the agreement, the Court could reasonably find that GLS is not a third-party beneficiary because it has not shown a total lack of ambiguity. *See Landry*, 485 Mass. at 342.

*Equitable Estoppel*

Under the doctrine of equitable estoppel, courts have estopped a plaintiff-signatory "from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the [plaintiff] has signed." *InterGen N.V.*, 344 F.3d at 145 (*quoting Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995)). "Federal courts generally 'have been willing to estop a signatory from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in

arbitration are intertwined with the agreement that the estopped party has signed.' " *Ouadani v*

*TF Final Mile LLC,* 876 F.3d31, 38 (1ˢᵗ Cir. 2017) *(quoting InterGen NV,* 344 F.3d at 145).

 Massachusetts law recognizes two circumstances in which equitable estoppel allows a

non-signatory to compel arbitration: "(1) when a signatory 'must rely on the terms of the written

agreement in asserting its claims against the non-signatory' or (2) when a signatory 'raises

allegations of substantially interdependent and concerted misconduct by both the non-signatory

and one or more of the signatories to the contract.' " *Machado*, 28 N.E.3d at 409 (*quoting*

*Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th. Cir. 2000)). The first

circumstance of reliance does not apply to this case, which does not allege breach of contract

claims. *See Silverwood Partners, LLC v. Wellness Partners, LLC*, 91 Mass.App.Ct. 856, 80

N.E.3d 355, 360 (2017) ("[T]he assertion of contract claims is an essential element of the first of

the two bases for equitable estoppel[.]").

 GLS argues that the second circumstance applies. "In assessing whether a plaintiff has

advanced sufficient allegations of concerted misconduct, courts frequently look to the face of the

complaint." *Machado*, 471 Mass. at 215. Courts have routinely found that where plaintiffs fail to

distinguish between defendants when asserting claims, they have effectively alleged

"interdependent and concerted misconduct." *See id*. (collecting cases).Because GLS does not

assert that Plaintiff must rely on the terms of the arbitration agreement to assert her claims, the

Court need only analyze whether her claims raise allegations of substantially interdependent and

concerted misconduct by Kelly and GLS. *See id.* To do so, the Court must look beyond the

parallel nature of the allegations, because "it is the relationship of the claims… that is key."

*CardioNet, LLC v. InfoBionic,* 2017 U.S. Dist. LEXIS 43350, *7 (*quoting Goldman v. KPMG*,

173 Cal. App. 4th 209, 223).

Courts must look at the face of the complaint when analyzing allegations of concerted misconduct. *See Tissera v. NRT New Engalnd*, 438 F.Supp. 3d 115, 123 (D.Mass. 2020) (Saris, J.) *quoting Machado*, 471 Mass. at 215. GLS argues that Plaintiff has asserted interdependent and concerted misconduct by GLS and Kelly by "lumping them together," treating them as a single entity in her complaint. "Lumping together" defendants can constitute an assertion of interdependent and concerted misconduct. *See Machado*, 471 Mass. at 216 ("the plaintiffs have consistently charged both System4 and NECCS with equal wrongs, failing to distinguish them throughout the evolution of this case, thereby effectively asserting 'interdependent and concerted misconduct' between them").[1]

Here, Plaintiff's claims against GLS and Kelly center on allegations of interdependent and concerted misconduct by both entities. Plaintiff does not distinguish between the two and often refers to GLS and Kelly throughout her Complaint as one "Company". ( Compl. ¶9.) Plaintiff specifically alleges:

- "On or around January 27, 2020, Ms. Steel-Rogers was hired by Global and Kelly (Global and Kelly collectively, the 'Company') as a Quality Control helper in Marlborough, MA." (Complaint ¶9)

- "Global and Kelly (both collectively and each individually) exercised control over the day-to-day aspects of Ms. Steel-Rogers's job." (Complaint ¶12)

- "As such, Ms. Steel-Rogers was jointly employed by both Global and Kelly." (Complaint ¶17)

- "Accordingly, the Company, including each of Kelly and Global, is an employer under the definition of M.G.L. c. 151B." (Complaint ¶¶77, 86, 98)

---

[1] This Court has held, however, that "lumping together" alone does not transform all claims into those of interdependent and concerted misconduct. *See Peterson v. Binnacle Capital Servs*., 364 F. Supp. 3d 108, 117 (D. Mass. 2019) ("[a]lthough Plaintiff does 'lump the two defendants together' in her complaint, the claims against them are neither substantially interdependent nor instances of concerted misconduct"). Nevertheless, because *Peterson* involved allegations against a non-signatory defendant entity that did not exist at the time of Plaintiff's hiring, it can be distinguished from the facts of this case. *See id.* Plaintiff knew that both GLS and Kelly existed, but still chose to lump them together in her claims.

- "The Company, by and through its agents . . . sexually Complaint ¶78)

Plaintiff alleges that GLS and Kelly "aided and abetted" each other, suggesting that in her claims that both entities acted in concert.  (Complaint ¶¶ 81, 82).

Plaintiff is estopped from avoiding arbitration with Defendant. She refers to herself as "jointly employed" by both entities and titles each count of the Complaint "Ms. Steel-Rogers v. Defendants." (Complaint ¶17), effectively establishing interdependent and concerted misconduct. In her allegations, Plaintiff asserts that it was both Kelly's and GLS's actions that contributed to the discrimination and retaliations she faced.

The parties also dispute whether the arbitration agreement contemplated the arbitration of employment disputes by GLS. GLS relies on cases from other jurisdictions that have applied equitable estoppel when the Plaintiff's claims resulted from an employment relationship, the arbitration agreement contemplated employment disputes, and the Plaintiff alleged interdependent misconduct. *Noye v. Johnson & Johnson*, 765 Fed. Appx. 742, 748 (3rd Cir. 2019). Plaintiff relies on *Hogan v. Spar Group*, which the parties agree is precedential. *See Hogan v. Spar Group*, 914 F. 3d 34 (1st Cir., 2019). *Hogan* held that a non-signatory third party was unable to enforce an arbitration agreement because the plaintiff's claims existed independently of the contract at issue, and because the claims were not sufficiently intertwined with the agreement. *Id.* at 42. However, Plaintiff' reliance on *Hogan* is undermined by key factual distinctions.

First, the agreement at issue in *Hogan* made no specific mention of an employment relationship or arbitration of employment-related disputes. *Id.* at 37. Plaintiff's claims are based on an alleged joint employment by GLS and Kelly, and stemmed from the arbitration agreement that specifically covered employment-related claims, including discrimination, harassment, and

relation. While the arbitration of employment disputes may have been contemplated in *Hogan*, the agreement at issue here clearly contemplates the arbitration of such disputes. Second, the *Hogan* court found that the plaintiff's claims were not sufficiently intertwined because, "Hogan clearly and unambiguously consented to arbitrate only claims against him and SBS." *Id.* at 36. As Plaintiff herself asserted in opposition GLS's third-party beneficiary status, there is ambiguity as to who can benefit from the arbitration clause. *See Landry*, 485 Mass. at 342. Because there is more than one possible interpretation of "related and affiliated companies" within the meaning of the arbitration agreement, Plaintiff did not "clearly and unambiguously [consent] to arbitrate only claims against…" the other signatory, as Hogan did.

Despite Plaintiff asserts' position that nothing prevents her from bringing claims against GLS and separately asserting that Kelly discriminated and retaliated against her in its handling of her termination, the Court finds that the claims against each entity allege interdependent and concerted misconduct. Accordingly, Plaintiff is equitably estopped from avoiding arbitration.

## Conclusion

For the reasons set forth, Defendant's Motion to Compel Arbitration (Docket No. 22) is **granted**. The case is dismissed without prejudice, pending the arbitration of Plaintiff' claims.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

**SO ORDERED.**